AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Kentucky

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Apple i-Phone seized from Mark Brown, currently<br>located: ATF Office, Lexington, Fayette County, KY<br>(described in Attachment A) | )<br>)<br>)<br>)<br>)     Case No.  5:12-MJ-5114-REW |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Eastern_____ District of _____Kentucky_____ *(identify the person or describe property to be searched and give its location):*  One Apple i-Phone, model number A1387, serial number C8WH10GSDTD0 and FCC ID#013043001301907, white in color with black and white cover described in Attachment A and made a part hereof, currently located: Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) office, 1040 Monarch Street, Lexington, Fayette County, Kentucky.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*  Please reference Attachment B, which is incorporated and made a part hereof.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

   ☑ evidence of a crime;

   ☑ contraband, fruits of crime, or other items illegally possessed;

   ☑ property designed for use, intended for use, or used in committing a crime;

   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of _____18_____ U.S.C. § _____1071_____ , and the application is based on these facts:  See Attached Affidavit of Robert M. Maynard, Special Agent, Bureau of Alcohol, Tobacco, Firearms, and Explosives, which is incorporated by reference and made a part hereof.

   ☑ Continued on the attached sheet.

   ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____Robert M. Maynard, Special Agent, ATF_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  **10/9/2012**

_____
*Judge's signature*

City and state:  Lexington, Kentucky

_____Hon. Robert E. Wier, United States Magistrate Judge_____
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT**

I, Robert M. Maynard, being duly sworn, depose and state that:

I am a Special Agent (SA) with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since September of 2005. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. Prior to my employment with ATF, I was employed as a police officer with the Lexington Division of Police, Lexington, Kentucky, for approximately one year. I am a Federal Law Enforcement Officer as defined in Rule 41 and am authorized by Federal Law to request a search warrant.

I have received specialized training in the enforcement of federal firearms, explosives, and arson laws. My training and experience has involved, among other things: (1) the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the purchase, possession, distribution, and transportation of firearms and controlled substances and the laundering and concealment of proceeds of firearms and drug trafficking; (2) surveillance; (3) analysis and processing of documentary, electronic, and physical evidence; (4) the legal and illegal purchase and possession of firearms; (5) the execution of arrest and search warrants and (6) wire interception investigations. I have also received specialized training as to the determination of interstate nexus with regards to firearms and ammunition.

The information contained in this affidavit is based upon my personal knowledge, my consultation with senior ATF agents, my review of certain records and documents, interviews of witnesses and defendants, and information provided by other law enforcement officers employed with the Lexington Division of Police.

As a result of my training and experience as an ATF Special Agent, I am familiar with federal criminal laws including the following:

Title 18 U.S.C., § 1071 — Harboring a Fugitive

Your Affiant knows, from his training and experience, that due to the advances in technology over the last several years, including but not limited to, wide-spread availability of the internet, the availability of on-line banking and access to other on-line services such as the ability to make travel arrangements, and social networking, individuals involved in criminal activity typically keep information pertaining to their criminal activity on computers and cellular phones.

1

This affidavit is submitted in support of an application for a search warrant to search the contents of an Apple iPhone cellular telephone, to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice and text messages, calling card numbers, e-mail/internet access information, photographs, test messages, and/or identifying information that may be stored in the memory of the cellular telephone. The cellular telephone is in ATF custody in Lexington, Kentucky.

I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of a violation of Title 18 U.S.C. § 1071 will be located in the above described cellular telephone. The information contained herein is not all the information I possess with respect to the commission of the crimes referred to herein.

### SPECIFICS OF SEARCH AND SEIZURE OF CELLULAR TELEPHONES

1. As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the cellular phone described in Attachment A, in whatever form they are found. The information set forth below regarding the Specifics of Search and Seizure of cellular telephones is based upon your Affiant's discussions on April 27, 2012 with Lexington Police Detective Joseph Sisson who is currently assigned to the Lexington Police Department's Computer Forensic Unit. Detective Sisson has held his current assignment since March of 2008. He has received specialized training in conducting forensic examinations of computers and other electronic media including cellular telephones. Specifically, he has had over 300 hours of formal training in conducting forensic examinations of electronic media and has conducted approximately 150 forensic examinations on various electronic media including lap top computers and cellular telephones.

2. Your Affiant knows from talking with Detective Sisson that seizures of evidence from cellular telephones and any media attached to the cellular phone that can store electronic media commonly requires agents to seize the cellular telephone to be processed later by a qualified forensics specialist in a laboratory or other controlled environment.

3. Your Affiant knows from discussions from Detective Sisson that cellular telephones and any items attached to the telephone including but not limited to SIM cards can store digital media. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.

2

4. Your Affiant knows from discussions with Detective Sisson, searching cellular telephones and any attached items capable of storing digital media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of digital media which can be recovered from cellular telephones requires even computer experts to specialize, so it is difficult to know before the search which expert should analyze the cellular telephone and any attached items capable of storing digital media. The search of cellular telephone and any attached items capable of storing digital media is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, deleted, password-protected, or encrypted files. Since this type of evidence is extremely vulnerable to tampering or destruction (either from external sources or from destructive code embedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

5. Your Affiant knows from discussions with Detective Sisson, that when any computer equipment, cellular telephones, storage devices, or programs are seized, and when any files or electronic data are recovered, it will be necessary to search and analyze these files and data in order to determine whether they are relevant to the activities of Mark BROWN. The analysis of electronically stored data, performed in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of the file cabinet for the pertinent files, in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exists that are intimately related to the subject matter of the investigation.

6. Based on discussions with Detective Sisson and your Affiant's experience, your Affiant knows that cellular telephones and cellular network servers may be important to a criminal investigation in two distinct and important aspects: (1) the objects themselves may be instrumentalities, fruits, or evidence of a crime, and/or (2) the objects may have been used to collect and store information about crimes in the form of electronic data. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

## FACTS IN SUPPORT OF PROBABLE CAUSE

7. On or about January 14, 2012 at approximately 0300 hours, Lexington Division of Police Officer Tyson Carroll observed a vehicle spinning its tires behind Tolly Ho, a restaurant located at 606 South Broadway, Lexington, KY. The vehicle is described as a black Ford F-450 bearing Kentucky registration 481469. Officer Carroll and Lexington Division of Police Officer Aaron Sherrard approached the vehicle and identified the driver as Mark BROWN and the passenger as Chasmagic LAWTON by obtaining their personal identifiers. Officer Carroll advised your affiant that LAWTON did not have any means of identification on his person. LAWTON provided Officer Carroll with his personal identifiers, which matched the identifiers LAWTON provided your affiant on October 24, 2011. Officer Sherrard obtained Mark BROWN's information, which matched the information BROWN provided your affiant in an interview on or about January 17, 2012 [detailed below in paragraph 16]. Officer Carroll advised your affiant that backup officers, to include Lexington Division of Police Officers Staci Shannon, who have had contact with BROWN and LAWTON in the past year, arrived and verified BROWN's and LAWTON's identities.

8. On this same date, Officer Carroll observed two pistols located in BROWN's lap. Lexington Division of Police Officer Aaron Sherrard secured the two pistols. Officers queried the firearms in NCIC to check if they were listed as stolen. Both firearms were not listed as stolen in NCIC. BROWN advised that he had sole possession of the firearms and that LAWTON at no time, was in possession of the firearms. BROWN advised that he had just picked up LAWTON and moved the pistols from the passenger seat to his lap. Both firearms were returned to BROWN.

9. The firearms are described as the following:

   a. One (1) firearm: manufacturer: Taurus, model: PT140, caliber: .40, Serial No.: SCV96589, type: semiautomatic pistol

   b. One (1) firearm: manufacturer: Glock, model: 32, caliber: .357, Serial No: PED282, type: semiautomatic pistol

10. Your affiant queried the Ford F-450's registration in the National Law Enforcement Telecommunications System (NLETS). The vehicle is registered to Pennie Thurman at ████████████████████████ Your affiant and law enforcement believe that the information in NLETS as reliable and accurate. Your affiant received the following information from NLETS website:

4

a. NLETS which is owned by the States, is a 501(c)(3) nonprofit organization that was created over 40 years ago by the principal law enforcement agencies of the States. The user population is composed of all of the United States and territories, all Federal agencies with a justice component, selected international agencies, and a variety of strategic partners that serve the law enforcement community that all cooperatively exchanging data.

b. The types of data being exchanged varies from motor vehicle and drivers' data, to Canadian and Interpol databases, to state criminal history records and driver license and corrections images. Operations consist of nearly 1 billion transactions a year to over 900,000 PC, mobile and handheld devices in the U.S. and Canada at 45,000 user agencies and to 1.2 million individual users.

11. On or about January 15, 2012 at approximately 2330 hours, Lexington Division of Police Officer Chris Burlile observed a black Cadillac Deville bearing Kentucky registration 229 CAR traveling on Haggard Lane. Officer Burlile initiated a traffic stop on the vehicle for having a non-illuminated license plate. The vehicle failed to stop and a short vehicle pursuit commenced. The vehicle abruptly stopped near 1883 Linton Road, Lexington, KY. After a short foot pursuit, Officer Burlile heard footsteps across a wooden deck and the screen door open at 1880 Charlbury Court with the fleeing subject out of sight. Officer Burlile recovered a Glock .357 caliber pistol near the front porch of 1880 Charlbury Court. Officer Burlile ascertained that the recovered firearm is the same firearm as possessed by Mark BROWN on the previous date [as described in paragraph 9(b)].

12. On or about January 17, 2012, your affiant and Lexington Division of Police Officer Chris Pope attempted to locate Mark BROWN at 1814 Ellison Court, Lexington, KY. Your affiant and Officer Pope made contact with Britnee Burdette at the residence. Burdett advised that BROWN is her children's father and does not live at the residence.

13. On this same date, Lexington Division of Police Detective Joe Duerson and Officer Bob Terry observed a Ford F-450 truck bearing Kentucky registration 481469 parked in front of 1834 Linton Avenue, Lexington, KY 40511.

14. Your affiant, ATF SA Ryan Caudill and Lexington Division of Police Officers Chris Pope and Corey Doane arrived at 1834 Linton Avenue. Your affiant and Detective Duerson and Officer Terry approached the front door of the residence. Your affiant and Detective Duerson were the only law enforcement officers on the front porch and in the immediate vicinity of the front door. Your affiant observed a light on in the window near the front door but immediately was turned off upon ringing the doorbell.

5

15. On this same date, your affiant rang the doorbell and officers observed subjects moving around inside the residence. After a subject asked who it was, your affiant identified himself as a law enforcement officer. The subject advised that he was getting dressed. Officer Pope identified BROWN through a large bay window on the front of the residence and observed BROWN pacing back and forth in the hallway prior to opening the door.

16. After several minutes, BROWN exited the front door and immediately closed it as he stepped outside onto the front porch. Your affiant advised BROWN that he was not under arrest.    BROWN advised that he did not have any identification on him but provided the following identifiers:

   a. Name: Mark Edmond BROWN Junior

   b. Date of Birth: 08/04/1988

   c. Address: 418 East Fifth Street, Lexington, KY

   d. Phone Number: 281-6141

17. The following is a synopsis of the interview:

   a. BROWN was stopped by Lexington Division of Police recently outside of Tolly Ho. BROWN was not sure of the date or time and advised that he doesn't keep up with dates or times. Initially, BROWN was evasive about who he was with when officers stopped him but eventually identified the subject as "Mag" [According to Officer Carol, the second subject in the vehicle was identified as Chasmagic LAWTON as described above in paragraph 7].

   b. BROWN had just returned from hauling horses and was waiting on "some females". A known male, identified as "Mag", entered his truck (BROWN pointed to the Ford F-450 in front of the residence). BROWN moved two pistols from the passenger seat to his lap so that Mag could sit down. BROWN identified one of the officers as Officer Staci Shannon and advised that Officer Shannon kept his identification. Once officers approached them BROWN claimed the firearms as his. BROWN and "Mag" left the area and he dropped "Mag" off "somewhere on Jefferson". BROWN advised that one of the Lexington Division of Police officers kept his identification.    Your affiant reminded BROWN that he needed to get a driver's license before

6

operating a vehicle. BROWN advised that he needed to go home and get "my stuff" before BROWN can get a replacement driver's license.

c. In the early morning hours of January 14, 2012, BROWN went to a party at a hotel of an unidentified female. BROWN got drunk and misplaced his firearm. BROWN was not initially sure which firearm was misplaced and that he needed to check his collection at his house. BROWN later advised that the firearm was a Glock. BROWN advised that he contacted the female and asked the location of the firearm. BROWN advised that the female was not aware of the firearm's location. SA Maynard requested the female's name and phone number. BROWN advised that he would provide it to your affiant later and requested his business card. Your affiant provided it to BROWN.

d. BROWN did not report the firearm as stolen or missing because he did not know how to report the firearm stolen. BROWN described that he regularly misplaces or loses firearms and described it as "not a big deal". BROWN described that he has lost or misplaced a firearm in the past because he left his vehicle unlocked. When asked if he wanted to file a missing or stolen report, BROWN advised that he did not have the serial number or manufacturer. When asked if he wanted to file the report knowing it was a Glock pistol and that he had possessed the firearm until a specific time documenting the last time he possessed the firearm, BROWN declined.

e. BROWN collects firearms and regularly purchases firearms from downtown and Court Days. BROWN regularly asks the sellers if the firearm is "legit". When selling firearms, BROWN regularly questions the buyers if they are a convicted felon. BROWN regularly shoots firearms at Bud's Shooting Range.

f. BROWN purchased the Glock from a white male known as Mark LNU [Mark LNU is identified as Mark REED. Your affiant interviewed REED and REED confirmed that he purchased the above described firearms in paragraph 9. Your affiant confirmed REED's identity after REED provided his Kentucky driver's license]. BROWN did not provide the name of the person he purchased the second firearm from. BROWN advised that he purchased the second firearm "a minute ago". BROWN did not provide a timeframe of when he purchased the firearm. BROWN described REED as someone that he regularly traded and purchased firearms with when REED needed money.

7

g. BROWN advised that he purchased a black Cadillac from a male known as Craig LNU.  BROWN purchased the vehicle for three hundred dollars ($300) and sold it to an unidentified female for five hundred dollars ($500).  BROWN advised that the tag was about to expire and sold it to the female.  BROWN advised that he explained the situation with the vehicle to the female and advised her to contact Craig. BROWN sold the vehicle two to three months ago.  Your affiant asked BROWN when the last time he had been in the vehicle but BROWN did not answer the question.

h. BROWN advised your affiant Brown was not involved in any kind of pursuit with the police.  BROWN reaffirmed that he had not seen the firearm since the night of the party and was not involved in anything that the firearm could be associated with.

i. Your affiant advised BROWN that receiving a firearm while under indictment is a violation of federal law.  BROWN confirmed that he was under indictment from a court case in Tennessee.

18. On or about January 19, 2012, Lexington Division of Police executed a state search warrant on a black Cadillac Deville bearing Kentucky registration 229 CAR.  The vehicle was stored in a secured facility at Bluegrass Towing, 1001 Manchester Street, Lexington, KY.  Officers took several DNA swabs from the steering wheel and driver's side door.  Officers recovered a receipt from University of Kentucky College of Dentistry to Mark Brown, dated December 14, 2011, from the driver's side door pocket.  Officers also recovered two (2) marijuana "roaches" from the ashtray and a digital scale from the rear floor board.  Officers also located several other pieces of mail and receipts but did not recover them.

19. On or about January 20, 2012, ATF Special Agent (SA) Rob Maynard and Lexington Division of Police Officer Burlile completed the search warrant on the vehicle.  SA Maynard photographed the vehicle.  SA Maynard collected several documents.  Following the search warrant, Officer Burlile returned the inventory to the state judge.  SA Maynard recovered the following:

a. From the glove box: A sealed envelope with paid postage containing a bill from Joseph Lawton, ███████████████████ ██████ to LFUCG Fire Department Ambulance Service, PO Box 34008, Lexington, KY 40588.  A check was also located in the envelope from Joseph Lawton, Sr, in the amount of one hundred

8

dollars. The check was issued to LFUCG Fire department, dated "01-13-12". The check was issued from Central Bank, Lexington, KY.

b. From the backseat:

    i. A yellow "Early Start" piece of paper providing the time of pick-up (06:13) and drop-off (10:49) for EJ Hayes School for M Brown. Your affiant knows the first name of M; however, because M is a minor, your affiant is using the initial M to protect the identity of the minor. The Parent/Guardian is listed as Brittnee Burdette.

    ii. Letter from Mark Brown to Brittnee Burdette, postmarked 01/31/2011. Burdette's address is listed as the Lexington Fayette County Jail at 600 Old Frankfort Pike, Lexington, KY 40510.

c. From the front passenger seat:

    i. Scrap piece of paper bearing "902 Aylesbury Dr, Apt 1, Lou 40242"

    ii. Copy of Kentucky registration 551 LWP

d. From the front passenger floorboard:

    i. Letter to Brittnee dated 02/09/2011

    ii. O'Reilly Auto Parts receipt in the name of Joseph Lawton at ▇▇▇▇▇▇▇▇▇▇ dated 01/12/12 at 1711 hours [CHASMAGIC LAWTON provided the same address to your affiant on October 24, 2011 as CHASMAGIC LAWTON'S home address].

    iii. Long John Silvers receipt dated 01/12/12 at 7:17pm (1911 hours).

    iv. Account Activity Ledger in the name of Burdette, Britnee dated 08/04/2011

20. Your affiant reviewed a surveillance video dated January 21, 2012 at approximately 0330 hours from Tolly Ho. The video was obtained by Officer Tyson Carroll. The surveillance video provided footage of three individuals

entering Tolly Ho as well from the interior. Your affiant identified Mark BROWN, Chasmagic LAWTON and an unknown black male enter the restaurant as well as walk through the restaurant together.

21. On February 6, 2012 at approximately 1630 hours, your affiant observed a white Ford F-150 truck exit the driveway at 466 Jefferson Street, Lexington. Your affiant observed the vehicle at the residence on several occasions throughout late January and early February 2012 during surveillance. During surveillance, your affiant observed that the registration on the vehicle was Kentucky 866 FJR. Your affiant previously queried the registration in NLETS. The vehicle was registered to Joseph LAWTON at ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

22. On this same date, your affiant observed the white F-150 turn from Jefferson Street onto Fifth Street and your affiant positively identified LAWTON as the driver. Your affiant was in a vehicle stopped at that intersection. A short vehicle pursuit commenced and the Ford F-150 stopped in front of 466 Jefferson Street. LAWTON exited the vehicle and was detained. Your affiant recognized LAWTON to be the same individual that was interviewed by your affiant on or about October 24, 2011. LAWTON continued to refer to your affiant as "Rob" throughout the contact and advised that he remembered your affiant from October 2011. Your affiant executed a federal search warrant for LAWTON's DNA. Your affiant collected two swabs of saliva and epithelial cells from LAWTON's interior right cheek and two swabs of saliva and epithelial cells from LAWTON's interior left cheek. LAWTON was subsequently arrested for Reckless Driving by the Lexington Division of Police.

23. On or about February 14, 2012, a federal arrest warrant was issued for Chasmagic LAWTON based upon a violation of Title 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm.

24. On or about February 15, 2012, ATF Agents and Lexington Division of Police officers attempted to execute the arrest warrant on LAWTON. During surveillance, a Fedex employee was observed attempting to deliver a package to 466 Jefferson Street, Lexington, KY. The Fedex employee made contact with a resident and the package was not accepted. Lexington Division of Police Detective Joe Duerson contacted the Fedex employee away from the resident and interviewed him. Detective Duerson ascertained that an older black female answered the door and advised the employee that Chasmagic no longer resides at the residence. Detective Duerson observed that the letter was from the US Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives. Detective Duerson, an ATF Task Force Officer for approximately seven (7) years, recognized the exterior of the letter as being from the Asset

Forfeiture and Seized Property Branch regarding the initiation of forfeiture proceedings.

25. Your affiant knows that this is the residence of Joseph and Henrietta Lawton, Chasmagic LAWTON's grandparents. On or about February 6, 2012, your affiant executed a federal search warrant for Chasmagic LAWTON's DNA in front of the residence and interviewed Joseph and Henrietta Lawton.

26. Your affiant continued to conduct surveillance on the various locations in Lexington, KY for several days. Your affiant did not observe LAWTON and subsequently, turned the fugitive apprehension over to the United State Marshal's Service. Your affiant was advised by Lexington Division of Police Detective Shannon Garner, a Task Force Officer with the Marshal's Service, that the Marshal's Service made contact with LAWTON's family members as well as LAWTON's associates in order to locate him. Detective Garner also advised that several sources of information advised that LAWTON fled Lexington following the execution of the DNA search warrant.

27. On or about February 19, 2012 at approximately 0300 hours, Lexington Division of Police responded to a large disorder at Tolly Ho. Once officers arrived, they made contact with a security guard. The security guard advised them that Mark BROWN and Chasmagic LAWTON were the cause of the disturbance and that they left the area in a black Ford F-450. The security guard was familiar with BROWN and LAWTON from prior incidences at the restaurant. Officers notified dispatch that BROWN and LAWTON left Tolly Ho in a black Ford F-450. Officers were aware that LAWTON had an outstanding federal arrest warrant.

28. On this same date at approximately 0320 hours, officers observed the above described vehicle at the Speedway on South Broadway near the intersection with Angliana Avenue. Officers attempted to make contact with the driver, later identified as BROWN. All commands were ignored. Sergeant Matt Greathouse observed the driver texting while officers attempted to make contact. Officer David Bradley approached the driver side door and was able to open the door and remove BROWN from the vehicle. Officer Bradley detected a strong odor of alcoholic beverage about BROWN's person. BROWN became very agitated and aggressive towards officers and began yelling and cussing. Officer Bradley arrested BROWN for disorderly conduct and alcohol intoxication. A Lexington narcotics K-9 alerted to the vehicle. Officers searched the vehicle and recovered a Glock .40 caliber pistol from the glove box. Sergeant Todd Phillips, who had prior police contact with BROWN, advised your affiant that this behavior was very out of the ordinary for BROWN, who is regularly very compliant with law enforcement. Officers

11

believed that BROWN was providing a distraction as LAWTON created distance away from law enforcement.

29. On or about May 1, 2012, your affiant received a copy of the incident report from Elliott Security Company, the security company employed by Tolly Ho. Eric Schwartz, an Elliott Security Company employee, reported the following:

   a. On February 19, 2012 at approximately 0255 hours, a large crowd formed outside Tolly Ho while waiting to gain admission to the restaurant. Schwartz was posted at the front door to maintain crowd control. Schwartz observed Mark BROWN join the crowd. Schwartz noted that BROWN was banned from the property.

   b. Schwartz noted that BROWN arrived in a black Ford F-450 bearing Kentucky registration 481689 [the actual registration for the vehicle is 481469].

   c. At approximately 0257 hours, three black males and one white male began arguing. Due to the disorder, Schwartz contacted Lexington Division of Police. BROWN advised that Schwartz did not need to call police and then attempted to remove the phone from his ear. After Schwartz hung up the phone, BROWN became angry and pushed him.

   d. Schwartz heard sirens in the distance and one of BROWN's friends urged him to leave. Schwartz noted that BROWN left the parking lot through a rear exit and drove away southbound on South Broadway.

   e. At approximately 0305 hours, Schwartz made contact with Lexington Division of Police at Tolly Ho and informed officers of the incident.

30. On or about May 2, 2012, ATF Special Agents (SA's) Rob Maynard and Ryan Caudill interviewed Eric Schwartz, a security guard for Elliott Security Company. The following is a synopsis of the interview:

   a. Schwartz was working the door in February 2012 at Tolly Ho. There was a large crowd inside Tolly Ho and security measures were in place to avoid surpassing the number of people allowed to be inside the restaurant. Schwartz observed Mark BROWN, a subject that he had come to know while working at Tolly Ho, standing in line. Schwartz also observed Chasmagic LAWTON, a subject that he knew from high school, in the line around the corner.

   b. Several individuals were involved in a disorder and Schwartz contacted Lexington Division of Police. BROWN became agitated with Schwartz and asked him why he always contacted the police. BROWN also attempted to take the phone away from Schwartz. BROWN also pushed Schwartz. LAWTON came to the front of the line and pulled BROWN away. BROWN and LAWTON left the area.

   c. Schwartz advised that there is video surveillance of the incident and he will attempt to locate it.

   d. Schwartz was aware that BROWN was arrested minutes later at the Speedway near Angliana Avenue.

31. On this same date, SA Maynard provided Schwartz with a photographic lineup. Schwartz immediately positively identified Mark BROWN. Schwartz initialed BROWN's photograph and identified the individual by the name he knew the subject by, which was Mark BROWN.

32. On this same date, SA Maynard provided Schwartz with another photographic lineup. Schwartz immediately positively identified Chasmagic LAWTON. Schwartz initialed LAWTON's photograph and identified the individual by the name he knew the subject by, which was Chasmagic LAWTON. Schwartz advised that he knew LAWTON from Tates Creek High School. Schwartz also competitively swam with LAWTON.

33. Your affiant reviewed BROWN's personal identifiers that were listed on the arrest report from this incident. All of the personal identifiers matched the information BROWN provided your affiant on or about January 19, 2012. Your affiant reviewed BROWN's criminal history obtained from the National Crime Information Center (NCIC). NCIC is a database that maintains several files related to the criminal justice system to include the Interstate Identification Index (III). III maintains an automated criminal history record that is accessible through NCIC. III is made up of records contributed by law enforcement agencies across the United States.

34. Upon reviewing BROWN's criminal history, your affiant observed a misdemeanor arrest on or about February 19, 2012 for Disorderly Conduct, 2nd Degree, Resisting Arrest and Alcohol Intoxication.

35. Sergeant Phillips and Sergeant Greathouse reviewed surveillance video from inside Speedway and ascertained that BROWN nor LAWTON exited the vehicle. A search of BROWN's person revealed a cellular telephone utilizing

13

cellular telephone number (859) 213-6796. Based upon officer's observation of BROWN texting while ignoring their commands to exit the vehicle, officers searched the phone's contact list. Sergeant Greathouse provided a copy of the contact list to your affiant.

36. On or about February 23, 2012, your affiant reviewed the contact list and queried the Lexington-Fayette County Jail's call records for any contacts from inmates. Specifically, one phone call was placed to (859) 420-9019 on or about September 14, 2011. The contact was listed as "Bra Bra" in BROWN's phone. Your affiant listened to a phone call placed from a female inmate at the Lexington Fayette County Jail to (859) 420-9019. Your affiant identified the voice on the receiving end as Chasmagic LAWTON. Your affiant interviewed LAWTON on or about October 24, 2011 and on or about February 6, 2012 and was familiar with his voice.

37. Your affiant contacted the manager at Tolly Ho to retrieve a copy of the video surveillance from February 19, 2012. The manager advised that the video had been deleted from the server.

38. On or about March 21, 2012, Lexington Division of Police Officer Robert Schwartz arrested Mark BROWN on an outstanding Failure to Appear warrant. Officer Schwartz inquired if BROWN had seen LAWTON. BROWN was uncooperative and advised that he did not know LAWTON. Officer Schwartz advised BROWN that LAWTON was a federal fugitive. Officer Schwartz also advised that if BROWN was involved with LAWTON, he could be charged with Harboring a Fugitive. BROWN advised that he read on Facebook that LAWTON was "killed by Mexicans". Officer Schwartz advised your affiant that BROWN had approximately five thousand dollars ($5,000) on his person.

39. On or about April 12, 2012, an indictment was filed against Mark BROWN for Receiving a Firearm while under Indictment in the US District Court, Eastern District of Kentucky. BROWN was indicted in the State of Tennessee for Possession of Cocaine for Resale in August 2011. An arrest warrant was issued.

40. On or about April 17, 2012, your affiant observed BROWN near 1834 Linton Road, Lexington, KY. BROWN was subsequently arrested near the intersection of Redcliff Road and Russel Cave Road in Lexington, KY. During a search of BROWN's person incident to arrest, your affiant recovered approximately seven hundred dollars ($700), a receipt from a Fairburn, GA Chick-Fil-A dated April 16, 2012 at approximately 1330 hours and an Apple i-Phone, white in color, bearing model number A1837. Your affiant was not able to observe a serial number on the phone. Your affiant observed that the

phone was locked. Your affiant observed that the phone received several calls while in ATF possession. Following each call, the phone displayed a list of missed calls (while still in the locked mode). Your affiant noted the missed calls or unread texts, specifically, the phone number or name associated with the call. Your affiant observed several unread texts from "Braa Braa", similar to the name described in paragraph 36.

41. On this same date, BROWN requested that the vehicle be released to his girlfriend, Brittnee Burdette, instead of being towed. Your affiant contacted Burdette, who arrived within a few minutes. Your affiant recognized Burdette as being the same person that your affiant and Officer Chris Pope spoke to at 1814 Ellison Court, Lexington, KY. Burdette provided her Kentucky Driver's License to your affiant. Once Burdette's driver's license was verified to be in status, Burdette was allowed to take possession of the vehicle.

42. On this same date, your affiant advised BROWN of his Miranda Rights which BROWN advised he understood by his rights by nodding his head. Your affiant records the conversation. BROWN advised that he knew LAWTON from Bryan Station High School but did not regularly associate himself with LAWTON. BROWN acknowledged that LAWTON was a fugitive. Your affiant questioned if LAWTON was with BROWN on or about February 19, 2012. BROWN denied being with LAWTON on that date and denied being at Tolly Ho on that date.

43. On this same date, your affiant attempted to contact (859) 213-6796, the last known number belonging to BROWN. The white Apple i-Phone was operational at the time of the test call. Your affiant observed that the Apple i-Phone did not ring and the call went straight to voicemail. Due to this incident, your affiant is aware that the Apple i-Phone in ATF custody has a separate phone number.

44. Your affiant has spoken with several law enforcement officers in the Lexington, KY area regarding the whereabouts of Chasmagic LAWTON. Officers have advised that several pieces of information have provided information that BROWN has been in contact with LAWTON and provided him with assistance prior to LAWTON's arrest.

45. On or about May 25, 2012, LAWTON was arrested in Lexington, KY on a federal indictment. During his arrest, officers observed that LAWTON was holding pieces of a cellular telephone in his hands. Your affiant took the pieces into custody and observed that the SIM card was missing from the phone. Your affiant believes that LAWTON attempted to destroy the phone in hopes of concealing information on the phone from law enforcement and also removed the SIM card to ensure that

the data on the phone was removed.  Officers were not able to locate the SIM card at the scene.

46. Your affiant knows that individuals communicate primarily by cellular telephone and those particularly involved in drug and firearms trafficking, rely on cellular telephones to conduct business.  This business is also applied to harboring fugitives.  Individuals associated with fugitives provide the fugitive with information about law enforcement activity as well as information about recent events involving friends or family to keep the fugitive up to date while in hiding.

47. Your affiant is aware that individuals will disassociate themselves with subjects that are fugitives.  Your affiant is aware that individuals will disassociate themselves with property, including contraband, which may link them with a crime such as a firearm, a vehicle or controlled substances.  On several occasions, BROWN disassociated himself with LAWTON as law enforcement have attempted to question BROWN about LAWTON.  On several occasions, BROWN acted as if he did not know LAWTON until April 17, 2012, BROWN acknowledged that he knew LAWTON.  BROWN also disassociated himself with the Cadillac LAWTON fled from on or about January 15, 2012 as well as the firearm recovered on the same date.

48. Your affiant is aware that the information contained in the white Apple i-Phone may provide information to LAWTON's whereabouts and/or evidence of individuals involved in harboring LAWTON as a fugitive.

49. A federal search warrant was applied for and granted on or about May 3, 2012.  The search warrant was returned on or about May 15, 2012 because law enforcement officers were unable to unlock the security password to the phone to download the information.  Between May 15, 2012 and August 1, 2012 your Affiant attempted to locate a local, state, or federal law enforcement agency with the forensic capabilities to unlock this specific type of phone.  However, each advised your Affiant they currently did not have the forensic capability to unlock this particular model of phone.  The phone has remained in law enforcement custody from the time of its seizure.  The phone has not been altered since the return of the previous search warrant.

50. On or about August 1, 2012, your affiant contacted Apple Incorporated and became aware from talking to an employee of Apple who is part of their Apple Litigation Group that Apple Inc. has the capabilities to bypass the security software on the above described phone with a search warrant at their facility in Cupertino, California.  As it was explained to your affiant, Apple Inc. will bypass the security software on the phone and download the contents of the phone to an external memory device, provided to them by your affiant.  Based upon their

backlog of similar requests, Apple employees advised that the earliest the download could take place is in middle of September of 2012.

51. On August 9, 2012, your affiant spoke with Detective Joe Sisson, Lexington Division of Police. Detective Sisson advised that he learned that the Apple i-Phone's SIM card had the FCC id number and Serial Number imprinted on it. Detective Sisson ejected the SIM card and provided the FCC id number and Serial Number to the above described phone.

52. On August 10, 2012, your Affiant communicated with Joann Chang, an employee of Apple assigned to the Apple Litigation Group who is familiar with the process utilized for bypassing the passcode. Ms. Chang advised your affiant that Apple can make arrangements to have a law enforcement officer chaperone the device during the bypass procedure. She further advised that once the Apple analyst bypasses the passcode, the data will be downloaded onto a USB external drive that will be provided by your Affiant. The device will then be returned to its locked state. There is a chance that the iPhone will not respond, which would prevent the analyst from extracting the information. Assuming the data can be extracted; it is securely downloaded into the USB external drive and then reviewed by the appropriate law enforcement officer pursuant to the scope of the search warrant.

53. Your affiant will ship the above described phone as sealed evidence, via FedEx, to the ATF San Jose Field Office where an ATF Agent will unseal the evidence and hand deliver it to Apple Inc. employees for the security bypass. The above described phone will remain in law enforcement custody or in the presence of law enforcement during the security bypass. Upon completion of the security bypass and download of information to the external memory device, the ATF Agent will seal the phone and external memory in evidence and return both items to the ATF Lexington Field Office where the information will be analyzed.

## CONCLUSION

54. The statements made in this affidavit are made based on the personal observations and investigation conducted by your affiant, and information communicated or reported to your affiant during the investigation by other participants in the investigation as the content of this affidavit indicates.

55. Based on the foregoing, your affiant believes there is probable cause to believe that the above described individual has committed a violation of 18 U.S.C. § 107 and, in light of the above information, there is probable cause to believe that WI, who is aware that LAWTON is a federal fugitive, has been in contact with LAWTON and BROWN provided him with resources.

56. Your affiant therefore respectfully requests that the requested search warrant be issued authorizing the search of a white Apple i-Phone seized from Mark BROWN Junior on or about April 17, 2012, as further described in Attachment A.

I declare under penalty and perjury that the foregoing is true and correct to the best of my knowledge.

Robert M. Maynard, Special Agent,
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to me this ___ day of October, 2012.

Robert E. Wier
United States Magistrate Judge

18

**ATTACHMENT A**

**DESCRIPTION OF EVIDENCE TO BE SEARCHED FOR AND SEIZED**

The following cellular telephones that was seized on or about April 17, 2012, from Mark BROWN's person near the intersection of Russell Cave Road and Radcliffe Road, Lexington, Fayette County, Kentucky, during the execution of a federal arrest warrant, and currently in the possession, custody and control of ATF, 1040 Monarch Street, Lexington, Fayette County, Kentucky (photo of below described telephone attached as part of attachment A):

- One (1) Apple i-Phone, Model #A-1387,  on an unknown network with an unknown access number (phone number), serial number C8WH10GSDTD0 and FCC ID#013043001301907

## ATTACHMENT B

Any appropriate law enforcement officer may search the cellular telephones listed on Attachment A and seize any of the following evidence or information contained within said cellular telephones.  The "relevant period" shall mean documents coming into existence during the period between February 14, 2012 to date.

All recoverable data that would show any relationship and or communication between the persons involved in violations of Title 18, United States Code, Section 1071 and/or establish whether any individual had knowledge of criminal activity.  As to the relevant period, this information would include, but is not limited to: Any phone books, address books, text messages, any and all call logs, E-mail, internet history, e-mail chat capture, capture files and other correspondence stored in electronic form that relate to harboring a federal fugitive.

All documents that contain names and/or contact information for individuals involved in providing assistance to the federal fugitive.

All photographic and video files that would identify the persons involved in violations of Title 18, United States Code, Section 1071.

All ledgers, public transportation records, accounting documentation including bank records, money order receipts, wire transfer receipts relating to providing assistance to the federal fugitive or to persons involved in providing assistance to the federal fugitive.

All electronic documentation from the relevant period which identifies the person(s) who have control, possession, custody or dominion over the property searched and ownership or use of the cellular telephones seized, including but not limited to, personal e-mail, banking records, scanned documents, electronic registration of products, login histories and user profiles.

As used above, the terms records and information include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored on the cellular telephones at issue.

